UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DASHAWN HUDSON, | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:26-cv-1231 |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY and | : | |
| DAVID KUZMA, | : | |
| | : | AUGUST 3, 2026 |
| Defendants. | : | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Dashawn Hudson ("Mr. Hudson"), by and through his undersigned counsel,

complaining of Defendants Yale University and David Kuzma, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1.     Plaintiff Dashawn Hudson is a Black gay man who earned promotion after

promotion in under two years in Yale University's kitchens, rising from temporary worker to

Third Cook at the Schwarzman Center, Yale's flagship hospitality venue. He brings this action

against Yale University and its then-Executive Chef, David Kuzma, for the racial harassment,

sexual harassment, disability-based harassment, and retaliation that Kuzma inflicted upon him

and that Yale permitted, tolerated, and failed to remedy.

2.     Kuzma's "welcome" to Mr. Hudson, on Mr. Hudson's first day at the

Schwarzman Center, was to ask him how he felt about the "n-word" and the "c-word." Soon

afterward, Kuzma told Mr. Hudson that he had "two strikes" against him: being a Black man,

and being gay.

3.     What followed was more than a year of open, escalating abuse: weekly orders that

Mr. Hudson "make salsa like a Mexican"; kitchen directives about "cooking for White people"

("don't put in too much seasoning") and for Black guests ("kill the steak until it's dead and dead again"); Kuzma's announcement that he "wanted" Mr. Hudson sexually but "had to have" a Hispanic coworker "first"; sexually explicit performances with kitchen produce carried out in front of Mr. Hudson and his coworkers; a suggestion, after Mr. Hudson sliced open his thumb at work, that he "sear it closed" on a hot grill; and a campaign of rumors, as Mr. Hudson's health collapsed under the abuse, that Mr. Hudson was "dying."

4.      This is not a case that turns on whose account a jury will believe. Yale has already investigated Mr. Hudson's allegations through its own Office of Institutional Equity and Accessibility ("OIEA"), interviewed the parties and six other Schwarzman Center employees, and found the core allegations true. Yale's investigator "generally found Mr. Hudson to be more credible than Mr. Kuzma," found Kuzma's account "less reliable, specifically due to the fact that he denied incidents that were substantiated by various witnesses," and concluded that Kuzma "engaged in sexual harassment in violation of Yale's Sexual Misconduct Policies" and "engaged in harassment in violation of Yale's Policy Against Discrimination and Harassment." Yale's investigator found the conduct "severe, particularly when considering the significant power disparity" between the Executive Chef and the workers who reported to him.

5.      Yale had every warning. Mr. Hudson objected to Kuzma directly. He reported the misconduct to the First Cook. On May 16, 2025 — the day Kuzma performed a sex act on a carrot in front of Mr. Hudson and four coworkers — Mr. Hudson reported the incident to Yale Hospitality's Director of Organizational and Workplace Excellence. Nothing was done. Yale's own investigation would later record that Kuzma's subordinates were "afraid to speak out due to fear of retaliation."

6.      The abuse broke Mr. Hudson's health. By Kuzma's own telling, Mr. Hudson called out sick 17 times between January and May 2025. On June 11, 2025, Mr. Hudson's medical providers placed him on a continuous medical leave. He lost more than seven months of his working life — from June 11, 2025 through January 29, 2026 — to a leave necessitated by conduct Yale's own findings confirm occurred. While Mr. Hudson was out, and while his complaint against Kuzma was under active investigation, Yale left the very man he had accused in a position to police his medical leave: Kuzma called Mr. Hudson's personal phone, reported his absence to Human Resources, and was instructed to keep "reach[ing] out," while Human Resources prepared an "unauthorized leave form which could result to his resignation for job abandonment."

7.      Kuzma's employment with Yale did not end until in or about November 2025 — nearly six months after Mr. Hudson's May 16, 2025 report to Yale Hospitality management, roughly five months after his formal written complaint, and only after the abuse had driven Mr. Hudson from the workplace and Mr. Hudson had filed charges of discrimination with the CHRO and the EEOC. Yale has never told Mr. Hudson why or how Kuzma's employment ended, or what discipline, if any, it ever imposed. Mr. Hudson returned to work on January 29, 2026, because he needed his job — not because Yale ever made him whole for what it had permitted.

8.      Mr. Hudson brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"); the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"); the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 et seq. ("CFEPA"); the Connecticut Family and Medical Leave Act, Conn. Gen. Stat. § 31-51kk et seq. ("CTFMLA"); and Connecticut common

3

law. He seeks compensatory damages, punitive damages, liquidated damages, lost wages and benefits, injunctive relief, attorney's fees, costs, and interest.

## PARTIES

9.     Plaintiff Dashawn Hudson is an adult resident of New Haven, Connecticut. He has been employed by Yale University since October 2022 and remains employed by Yale today. Mr. Hudson is a Black gay man.

10.     Defendant Yale University ("Yale") is a specially chartered, non-profit Connecticut corporation with its principal place of business in New Haven, Connecticut. Yale employed approximately 20,847 people as of January 2025. Yale is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b); the ADA, 42 U.S.C. § 12111(5); the FMLA, 29 U.S.C. § 2611(4); the CTFMLA, Conn. Gen. Stat. § 31-51kk(4); and CFEPA, Conn. Gen. Stat. § 46a-51(10).

11.     Defendant David Kuzma is an adult who, upon information and belief, resides in Connecticut. At all times relevant to the conduct alleged herein, Kuzma was employed by Yale as the Executive Chef of the Schwarzman Center — a position he held from the venue's opening in 2021 — and was Mr. Hudson's supervisor. Kuzma worked for Yale for approximately seventeen years. Upon information and belief, Kuzma's employment with Yale ended in or about November 2025.

12.     At all relevant times, Kuzma acted in the course and scope of his employment by Yale and as Yale's agent, and was empowered by Yale to direct Mr. Hudson's work, set and change his schedule and assignments, evaluate and criticize his work, monitor his attendance and leave, and initiate or effectively recommend tangible employment actions affecting him. Kuzma

sat on the hiring committee that selected Mr. Hudson for his Third Cook position at the Schwarzman Center.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction over Mr. Hudson's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4), and pursuant to 42 U.S.C. § 2000e-5(f)(3).

14. This Court has supplemental jurisdiction over Mr. Hudson's state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same common nucleus of operative fact as the federal claims and form part of the same case or controversy.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3). All of the unlawful employment practices alleged herein were committed in New Haven, Connecticut, within this District; Defendant Yale resides and transacts business in this District; and, upon information and belief, Defendant Kuzma resides in this District.

## ADMINISTRATIVE PROCEDURES

16. On or about August 18, 2025, Mr. Hudson filed a verified complaint of discrimination against Yale with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), CHRO No. 2630129, which was dual-filed with the United States Equal Employment Opportunity Commission ("EEOC") as EEOC Charge No. 16A-2025-01685. The complaint alleged, among other things, discrimination and harassment on the basis of race, color, sex, sexual orientation, and disability, sexual harassment, and retaliation for Mr. Hudson's opposition to discriminatory conduct.

17. On July 14, 2026, the EEOC issued Mr. Hudson a Notice of Right to Sue. This action is commenced within ninety days of Mr. Hudson's receipt of that notice.

18.     The CHRO has released its jurisdiction over Mr. Hudson's complaint and has authorized Mr. Hudson to commence a civil action on his CFEPA claims against Yale.

19.     All conditions precedent to the commencement and maintenance of this action, and to the relief requested herein, have been performed, have occurred, or have been waived.

## FACTUAL ALLEGATIONS

### A.  Mr. Hudson Earns His Way Up at Yale.

20.     Mr. Hudson began working for Yale in October 2022 as a temporary ("casual") employee.

21.     On the strength of his performance, Yale hired Mr. Hudson as a permanent employee on October 4, 2023, as a General Services Assistant. Yale then promoted him to Cook's Helper on December 10, 2023, and to Third Cook at Yale's Silliman College on March 24, 2024. In July 2024, he moved to Yale's Culinary Service Center, and in or about late July or August 2024, Mr. Hudson was selected for a Third Cook position at the Schwarzman Center, Yale's flagship hospitality and events venue.

22.     In less than two years, Mr. Hudson rose from temporary worker to Third Cook at Yale's premier venue — a measure of his skill, reliability, and work ethic. At all relevant times, Mr. Hudson performed his duties at a high level.

23.     At the Schwarzman Center, Mr. Hudson's supervisor was Defendant Kuzma, the Executive Chef. Kuzma identifies as a White heterosexual man.

### B.  Kuzma's "Welcome": the "N-Word," the "C-Word," and "Two Strikes."

24.     On Mr. Hudson's first day at the Schwarzman Center, while personally giving Mr. Hudson a tour of the facility, Kuzma asked Mr. Hudson — his new Black subordinate — how he felt about the "n-word" and the "c-word."

25.     Mr. Hudson, stunned, told Kuzma that he did not approve of the use of the n-word. Mr. Hudson did not report the incident at the time because, as he later told Yale's investigator, he "had just started the job and did not want to make a stink about it."

26.     Shortly after Mr. Hudson started at the Schwarzman Center, Kuzma told Mr. Hudson that he had "two strikes" against him: (1) being a Black man; and (2) being gay.

27.     Kuzma made materially identical comments to other Black employees under his command. Kuzma told Kismet Douglas, a Black female Third Cook, several times: "You have three things against you. You are a woman. You are Black, and you are short." Kuzma also repeatedly commented on Ms. Douglas's hair.

28.     Yale's own investigation later substantiated each of these facts: the first-day "n-word" and "c-word" question, the "two strikes" comment to Mr. Hudson, and the "three things against you" and "nice hair" comments to Ms. Douglas.

**C.  "Make Salsa Like a Mexican": Racial Degradation as a Management Style.**

29.     Kuzma ran the Schwarzman Center kitchen along explicitly racial lines. As First Cook Joshua Russo later told Yale's investigator, Kuzma regularly declared that particular ethnic groups should prepare the foods "traditionally associated with their culture," announcing, among other things: "The Mexicans make salsas. The gringos can't touch it."

30.     Mr. Hudson was assigned to prepare salsa every week. And every week, Kuzma berated and belittled him over the dish and ordered him to "make salsa like a Mexican."

31.     Kuzma set Mr. Hudson up to fail: he denied Mr. Hudson the instruction, accurate recipes, and demonstrations that would have allowed him to succeed, while excessively and publicly criticizing every result. Mr. Russo told Yale's investigator that the relationship "devolved to the point where nothing Dashawn did was good enough or right and he wasn't

7

going to get it right." The weekly abuse continued until Mr. Hudson suffered an emotional breakdown and demanded to be shown how to prepare the dish properly.

32. Yale's investigation substantiated this conduct as well, finding it "more likely than not that Mr. Kuzma told Mr. Hudson to 'make salsa like a Mexican'" and that Kuzma criticized Mr. Hudson's preparation of salsa on a weekly basis.

33. Kuzma's racialized commentary extended to Yale's guests. Before catering assignments, Kuzma would give instructions to the effect of: "we're cooking for White people, don't put in too much seasoning," and, for Black guests, "it's Black people, kill the steak until it's dead and dead again."

34. In or about February 2025, Mr. Hudson was assigned to prepare paneer, a dry cheese dish, and was given four different recipes by Kuzma, Mr. Russo, and a coworker. Mr. Hudson prepared each recipe as written; Kuzma rejected every attempt and, in doing so, insinuated that Black people cannot read.

35. Kuzma demeaned Mr. Hudson in terms freighted with race and class. After Mr. Hudson prepared the staff "family meal" for approximately 75 employees, Kuzma erupted at him: "I DON'T EAT OFF PAPER PLATES! I'M NOT POOR!" Mr. Hudson finally responded: "If you want to eat off fine China please bring it in and don't treat me like this. And you're welcome."

36. Kuzma treated the Black and brown employees under his command with condescension and contempt. Upon information and belief, Kuzma referred to staff members of color as "the help," and denied them the professional support and guidance he extended to favored employees. Third Cook Michael Fox told Yale's investigator that he observed racial patterns in Kuzma's assignment of work: Asian employees tended to be assigned to favorable

8

plated events, while African American employees were more likely to be assigned to "unfavorable" tasks that were "challenging and difficult."

37.     Kuzma also harassed other employees in Mr. Hudson's workplace on the basis of national origin and religion. Kuzma publicly interrogated coworkers about whether Cook's Helper Veronica Romero, a Latina employee, had renewed her immigration papers — telling her, Mr. Hudson alleges, that Immigration and Customs Enforcement would "come and get her" — prompting other employees to question Ms. Romero about her status and leaving her visibly upset. Yale's investigation confirmed that Kuzma "publicly asked about Ms. Romero's immigration documentation." Mr. Hudson also reported that Kuzma told Timia Martin, a Muslim employee, that she could not wear her religious garments while working.

38.     Kuzma boasted that he had "diarrhea of the mouth," and his abuse continued no matter how many times Mr. Hudson and others communicated — verbally and nonverbally — that it was unwelcome, offensive, and hurtful. When employees objected, Kuzma escalated.

39.     Kuzma maintained a system of reward and punishment around his abuse: employees who "went along" with his so-called jokes were treated better and bothered less, while employees who expressed discomfort or objected — like Mr. Hudson — were targeted and treated more harshly.

## D.  The Injury: "Sear It Closed" on the Grill.

40.     On or about March 28, 2025, while performing an unexpected, last-minute task and as Kuzma approached him, Mr. Hudson cut his thumb, suffering a laceration that required medical attention. Yale admits that Mr. Hudson suffered a laceration at work on March 28, 2025.

9

41. Kuzma's response to his bleeding subordinate was to suggest that Mr. Hudson "put [his] finger on the hot grill to sear it closed," because the healing process would "take too long."

42. Mr. Hudson was out of work from March 29, 2025 to April 14, 2025, under doctor's orders, on a workers' compensation claim arising from the laceration.

43. When Mr. Hudson returned to work in April 2025, Kuzma harassed him about having been out on medical leave, mocked him, and blamed him for matters beyond his control.

**E. "He's Dying": Kuzma Turns Mr. Hudson's Health Into Workplace Gossip.**

44. Following the injury, and as Mr. Hudson's health deteriorated under Kuzma's abuse, Kuzma made Mr. Hudson's medical condition a subject of workplace rumor, speculation, and stigma.

45. Kuzma made inappropriate and stigmatizing comments about Mr. Hudson's medical appointments; interrogated Mr. Hudson about his medical appointments and conditions beyond any legitimate business need; disseminated Mr. Hudson's private medical information — real and invented — throughout the workplace; and falsely told other employees that Mr. Hudson was "dying."

46. The "dying" rumor and Kuzma's other disclosures isolated Mr. Hudson from his coworkers, subjected him to unfounded fears and speculation about his health, damaged his professional reputation, and caused him severe emotional distress.

47. When Mr. Hudson appropriately asserted his right to keep his medical information private, Kuzma retaliated by interfering with Mr. Hudson's approved medical care: refusing to honor previously approved time off for medical treatment, questioning the legitimacy

of his medical appointments, and erecting obstacles to necessary care — forcing Mr. Hudson to choose between protecting his job and protecting his health.

**F. The Sexual Harassment: "He Wanted" Mr. Hudson.**

48.     Kuzma's harassment of Mr. Hudson was sexual as well as racial, and it escalated through the spring of 2025.

49.     In or about March 2025, Kuzma asked Mr. Hudson whether he had ever "had a vanilla man" — an inquiry Mr. Hudson understood to be a question about whether he had ever had sex with a White man.

50.     On or about March 20, 2025, Kuzma told Mr. Hudson and coworker Michael Fox that, while Kuzma was using the bathroom, a man kept "looking at his penis" and remarking on its large size.

51.     Later that same day, Kuzma told Mr. Hudson that he "wanted" him — sexually — but that he "needed to have" another male employee, Mr. Hudson's Hispanic coworker Caesar Sanchez, "first."

52.     Yale's investigation substantiated this allegation, finding "sufficient support" for the fact that Kuzma told Mr. Hudson that he "wanted him" but "needed to have" another male staff member "first."

53.     Kuzma also pried into Mr. Hudson's private life on the basis of his sexual orientation: he asked Mr. Hudson whether Mr. Hudson was "the girl or boy" in his relationship with his fiancé, and, when a female coworker gave Mr. Hudson cupcakes around Thanksgiving 2024, told Mr. Hudson that his "husband" would be mad at him.

54.     On May 16, 2025, in the downstairs kitchen, Mr. Hudson asked Kuzma to confirm the proper size to cut carrots and celery for an event. In front of Mr. Hudson's team of

four coworkers — Jennifer Rodriguez, Kai Sricharoenta, Veronica Romero, and Maria Ojeda — Kuzma answered by taking a whole carrot and shoving it down his own throat while staring directly into Mr. Hudson's face, and then shoving produce into Ms. Romero's face, demanding to know whether she "could do that" and "how much could she take."

56. Ms. Ojeda confirmed the incident to Yale's investigator, recounting that Kuzma put produce to Ms. Romero's face and said, "Put it in your mouth and see how much can go in your mouth," and describing the conduct as sexual: "that's how it felt to me and all of us. We all felt uncomfortable." Ms. Rodriguez likewise confirmed to the investigator that Kuzma "took the whole carrot" in his mouth and challenged Ms. Romero with words to the effect of, "Can you do this?"

56. Yale's investigation found that the incident occurred as Mr. Hudson described it: "Mr. Kuzma responded by placing a carrot down his throat in a sexual manner and waving the carrot in the face of Ms. Romero while asking her whether she could place the entire carrot in her mouth." Yale's investigator expressly rejected Kuzma's denial, which multiple eyewitnesses contradicted.

57. That same day, May 16, 2025, Mr. Hudson reported the incident by telephone to Agatha Williams, Yale Hospitality's Director of Organizational and Workplace Excellence, leaving a voicemail identifying himself and describing concerns at the Schwarzman Center. Yale took no action in response.

58. On or about May 29, 2025 — Mr. Hudson's May 16 report having gone unanswered — Mr. Hudson asked Kuzma for direction on how to cut and plate mushrooms for an event serving approximately 300 guests. Kuzma referred to the "girth" of the mushrooms,

pointed at the examples Mr. Hudson had cut, and announced that one of the mushrooms "looked like his penis tip," in the presence of Mr. Hudson's coworkers.

59.    Yale's investigation substantiated the mushroom incident as well.

60.    Sexualized degradation was Kuzma's management idiom. Mr. Russo told Yale's investigator that Kuzma routinely illustrated portion sizes by instructing his staff to "picture me in a cocktail dress with high heels."

**G. The Toll: Kuzma Destroys Mr. Hudson's Health and Forces Him From the Workplace.**

61.    Kuzma verbally abused Mr. Hudson on an almost daily basis, creating an environment of fear and anxiety. In Mr. Hudson's words, coming to work at the Schwarzman Center became "an anxious nightmare." When Kuzma was away, the kitchen ran more smoothly; even then, Kuzma's communications by telephone were at times inappropriate and offensive.

62.    The cumulative abuse — racial, sexual, and medical — caused Mr. Hudson extreme emotional distress, symptoms of post-traumatic stress disorder, anxiety, self-doubt, humiliation, exhaustion, and burnout, and destroyed his trust in Yale's leadership.

63.    The toll registered in real time. By Kuzma's own account to Yale's investigator, Mr. Hudson called out sick 17 times between January and May 2025 — a contemporaneous measure of what Kuzma's conduct was doing to Mr. Hudson's mind and body.

64.    June 10, 2025 was Mr. Hudson's last day of work before his medical providers removed him from the workplace. Effective June 11, 2025, Mr. Hudson began a continuous medical leave of absence for his own serious health condition — a leave made necessary by the hostile work environment Defendants created and maintained.

65.    Mr. Hudson's leave was supported by medical certification and was approved under the federal FMLA and the CTFMLA until those entitlements were exhausted, and

13

thereafter under Yale's own leave policies, ultimately extending from June 11, 2025 through January 29, 2026.

66.    On June 17, 2025, Mr. Hudson filed a written complaint with Yale's Office of Institutional Equity and Accessibility reporting Kuzma's sexual harassment, racial harassment, discrimination, and retaliation. His report identified more than a dozen witnesses and other victims by name.

67.    Mr. Hudson's report told Yale, among other things: that Kuzma "thoughtfully preys on certain people in certain situations"; that employees who went along with Kuzma's so-called "jokes" were "treated better and not bothered as much," while those who objected were "targeted and treated harsher"; that Kuzma "abuses his power by retaliating in different ways if he doesn't get his way"; that "[e]ven after reporting this to management, nothing was done"; and that "[s]o many people before me have witnessed and experienced this and he has yet to be held accountable."

## H. While His Complaint Is Pending, Yale Lets the Accused Harasser Police His Medical Leave.

68.    Yale did not remove Kuzma from Mr. Hudson's chain of command while it investigated Mr. Hudson's complaint. Instead, Yale left Kuzma in a position to monitor, report on, and police the very medical leave that Kuzma's abuse had made necessary.

69.    On August 14, 2025 — one day after the then-certified period of Mr. Hudson's leave ended, and while Mr. Hudson's harassment complaint against Kuzma was pending — Kuzma personally called Mr. Hudson's personal cell phone. Kuzma then reported to Yale Human Resources and management that Mr. Hudson "should have returned to work," that he "did try and reach out to him," and asked Human Resources to "advise on next steps."

14

70. The next day, August 15, 2025, Yale Human Resources Business Partner Jordan Taylor instructed Kuzma to "reach out" to Mr. Hudson again "if he misses his 3rd day," and advised: "By the 5th day we will send an unauthorized leave form which could result to his resignation for job abandonment."

71. Yale thus threatened the job of an employee who was out on medical leave caused by his supervisor's abuse — and assigned the accused supervisor himself to make the contacts — while the employee's harassment complaint against that supervisor was under active investigation. Yale's OIEA issued its formal Notice of Investigation to Kuzma on August 21, 2025, days after these communications.

72. Kuzma contacted Mr. Hudson again on or about September 11, 2025, while Mr. Hudson's leave recertification was being processed, and monitored and reported his absences on the days that followed.

73. Mr. Hudson's absences were, in fact, protected: his physicians extended his leave, and Yale ultimately approved the entire continuous leave through January 29, 2026. The threat to convert his medically necessary absence into a "resignation for job abandonment" — communicated through and alongside contacts from his abuser — served no legitimate purpose and would dissuade any reasonable employee from complaining of discrimination or exercising his right to medical leave.

74. On or about August 18, 2025, in the midst of this pressure campaign, Mr. Hudson filed his verified complaint of discrimination with the CHRO and the EEOC.

**I. Yale's Own Investigation Finds That Kuzma Did It.**

75. OIEA investigated Mr. Hudson's complaint for more than five months. It interviewed Mr. Hudson three times; interviewed Kuzma twice; and interviewed six other

Schwarzman Center employees: Kai Sricharoenta, Jennifer Rodriguez, Joshua Russo, Maria Ojeda, Xuewei "Sherry" Chen, and Michael Fox. Veronica Romero — at whom Kuzma had thrust the carrot — declined to participate.

76. Kuzma denied everything, including incidents that multiple eyewitnesses confirmed. He denied the carrot incident, for example, by claiming that the Schwarzman Center "uses pre-cut vegetables."

77. On November 24, 2025, OIEA issued its Findings Report, OIEA Case No. 2024136701 (the "Findings Report"). The Findings Report concluded that Kuzma violated Yale's policies, and it made, among others, the following determinations:

a. "OIEA generally found Mr. Hudson to be more credible than Mr. Kuzma because the information he provided to OIEA remained consistent over time. Moreover, several witnesses provided accounts that aligned with Mr. Hudson's statements, further substantiating his credibility."

b. "[T]he information provided by Mr. Kuzma was less reliable, specifically due to the fact that he denied incidents that were substantiated by various witnesses."

c. Kuzma "engaged in repeated unwelcome conduct of a sexual nature while working in the Schwarzman Center," and that conduct "was severe, particularly when considering the significant power disparity between Mr. Kuzma as the Executive Chef on the one hand and Mr. Hudson and the other witnesses, who reported to or up through him, on the other hand."

d. "[T]he information supports that Mr. Kuzma engaged in sexual harassment in violation of Yale's Sexual Misconduct Policies."

16

e. Kuzma made "race, national origin, and sexual orientation-based comments on a persistent basis to individuals who reported to or up through him"; the conduct was "objectively offensive"; and the incidents "collectively constituted harassment," such that "the information supports that Mr. Kuzma engaged in harassment in violation of Yale's Policy Against Discrimination and Harassment."

78.     Among the facts OIEA expressly substantiated were: the May 2025 carrot incident; the May 2025 comparison of a mushroom to Kuzma's "penis tip"; Kuzma's statement that he "wanted" Mr. Hudson but "needed to have" another male staff member "first"; Kuzma's weekly criticism of Mr. Hudson's salsa and his instruction to "make salsa like a Mexican"; Kuzma's statement that Mr. Hudson had "two strikes against him as a gay Black man"; Kuzma's first-day question about the "n-word" and the "c-word"; and Kuzma's repeated "three things against you" and "nice hair" comments to Ms. Douglas.

79.     The Findings Report also recorded the atmosphere of fear Kuzma cultivated: witnesses "shared feeling uncomfortable and simultaneously afraid to speak out due to fear of retaliation." Mr. Russo described Kuzma's "vindictive streak": "if he is mad at you, he may not update you regarding a (scheduling) change."

80.     The Findings Report recorded the harm to Mr. Hudson: Kuzma's behavior "adversely affected his mental health, resulting in increased absences from work and the need to seek professional mental health support to manage the stress caused by Mr. Kuzma's behavior."

**J. Yale's Response: Deny to the Government, Tell Mr. Hudson Nothing.**

81.     Even as its own investigation was substantiating Mr. Hudson's account, Yale told the CHRO otherwise. In its November 10, 2025 response to Mr. Hudson's CHRO complaint —

verified under penalty of perjury and filed exactly two weeks before the Findings Report issued — Yale asserted that it "lacks sufficient information" to respond to virtually every allegation of harassment and discrimination.

82.    The Findings Report itself imposed no discipline: it closed by "remind[ing] all parties of their continuing obligations regarding non-retaliation." Upon information and belief, Kuzma's employment with Yale ended in or about November 2025 — the same month the Findings Report issued. Yale has never disclosed to Mr. Hudson the circumstances of Kuzma's departure, the reasons for it, or what discipline, if any, Yale ever imposed upon Kuzma for the misconduct Yale's own investigation substantiated.

83.    By the time Yale parted ways with Kuzma, it was far too late to spare Mr. Hudson anything. Yale had kept Kuzma in command of the Schwarzman Center kitchen for nearly six months after Mr. Hudson's May 16, 2025 report and roughly five months after his June 17, 2025 OIEA complaint — long enough for Kuzma to police the medical leave of the very man who had accused him, and for Yale Human Resources to threaten that man's job while his complaint was under active investigation. Upon information and belief, Yale has not filled the Executive Chef position at the Schwarzman Center since Kuzma's departure.

84.    Mr. Hudson returned to work on January 29, 2026 — because he needed his job, not because Yale ever accounted for what it had permitted. He returned having lost more than seven months of wages and benefits, still carrying the psychological injuries Kuzma inflicted, to an employer that has never told him what, if anything, it ever did to hold his abuser accountable — or whether Kuzma's departure had anything to do with him at all.

**K. Mr. Hudson's Damages.**

85.     As a direct and proximate result of Defendants' unlawful conduct, Mr. Hudson has suffered and continues to suffer: severe emotional distress; symptoms of post-traumatic stress disorder; anxiety, humiliation, embarrassment, and loss of dignity; damage to his professional reputation; physical injury; loss of enjoyment of life; and continuing psychological harm requiring professional mental-health treatment — a need recorded in Yale's own Findings Report.

86.     As a further direct and proximate result of Defendants' unlawful conduct, Mr. Hudson lost more than seven months of wages and benefits during the medical leave that Defendants' conduct made necessary, from June 11, 2025 through January 29, 2026. At the time, Mr. Hudson earned $34.07 per hour, as Yale reported to the CHRO.

87.     Defendants' conduct was intentional, malicious, wanton, and oppressive, and was undertaken with reckless indifference to Mr. Hudson's rights under federal and state law.

**COUNT ONE**
**Hostile Work Environment and Discrimination Because of Race and Color**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.**
**(Against Defendant Yale University)**

88.     Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

89.     Title VII makes it unlawful for an employer to discriminate against any individual with respect to the terms, conditions, or privileges of his employment because of his race or color. 42 U.S.C. § 2000e-2(a)(1).

90.     Kuzma subjected Mr. Hudson to unwelcome harassment because of his race and color, including, among other things: the first-day "n-word" and "c-word" interrogation; the "two

19

strikes" declaration; the weekly "make salsa like a Mexican" abuse; the racialized instructions regarding seasoning and steak for White and Black guests; the insinuation that Black people cannot read; the "I'M NOT POOR" tirade; the discriminatory withholding of instruction and support; and the discriminatory assignment of unfavorable work — all of it against the backdrop of Kuzma's open racial, ethnic, and religious harassment of other employees of color in Mr. Hudson's workplace.

91.     The harassment was severe and pervasive: it was frequent, weekly and at times daily; it was humiliating and degrading; it emanated from the highest-ranking figure in Mr. Hudson's kitchen; and it altered the terms and conditions of Mr. Hudson's employment, ultimately driving him from the workplace onto more than seven months of medical leave. Yale's own investigator found the conduct persistent, "objectively offensive," and violative of Yale's own anti-harassment policy.

92.     Mr. Hudson perceived, and any reasonable person in his position would perceive, the environment to be hostile and abusive.

93.     Kuzma was Mr. Hudson's supervisor within the meaning of Title VII, empowered by Yale to direct his work, control his schedule and assignments, monitor his attendance and leave, and take or effectively recommend tangible employment actions. Yale is vicariously liable for Kuzma's conduct. In the alternative, Yale knew or should have known of the harassment — through Mr. Hudson's objections, his reports to management including his May 16, 2025 report to Yale Hospitality's Director of Organizational and Workplace Excellence, and the open and notorious character of Kuzma's conduct — and failed to take prompt and effective remedial action.

20

94. As a direct and proximate result of Yale's conduct, Mr. Hudson suffered the damages described above, including severe emotional distress and the loss of more than seven months of wages and benefits.

95. Yale acted with malice or with reckless indifference to Mr. Hudson's federally protected rights, entitling him to punitive damages under 42 U.S.C. § 1981a.

## COUNT TWO
### Hostile Work Environment and Discrimination Because of Sex, Including Sexual Harassment and Sexual-Orientation Discrimination
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
### (Against Defendant Yale University)

96. Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

97. Discrimination because of an employee's sexual orientation is discrimination because of sex in violation of Title VII. Bostock v. Clayton County, 590 U.S. 644 (2020).

98. Kuzma subjected Mr. Hudson to unwelcome sexual harassment and to harassment because of his sex and sexual orientation, including, among other things: announcing that he "wanted" Mr. Hudson sexually but "needed to have" a Hispanic coworker "first"; asking whether Mr. Hudson had ever "had a vanilla man"; interrogating Mr. Hudson about whether he was "the girl or the boy" in his relationship; recounting to Mr. Hudson that a man admired Kuzma's penis in the bathroom; performing a simulated sex act on a carrot while staring into Mr. Hudson's face; and comparing a mushroom Mr. Hudson had prepared to Kuzma's "penis tip" — conduct Yale's own investigator found to constitute sexual harassment.

99. The harassment was severe and pervasive, subjectively and objectively hostile, and altered the terms and conditions of Mr. Hudson's employment. Yale's own investigator

21

found the conduct "severe, particularly when considering the significant power disparity" between Kuzma and the employees who reported to him.

100.    Yale is vicariously liable for the conduct of Mr. Hudson's supervisor and, in the alternative, is liable for its own negligent failure to prevent and remedy harassment of which it knew or should have known, including after Mr. Hudson's May 16, 2025 report — a report Yale ignored while Kuzma escalated within two weeks to the "penis tip" incident.

101.    As a direct and proximate result of Yale's conduct, Mr. Hudson suffered the damages described above.

102.    Yale acted with malice or with reckless indifference to Mr. Hudson's federally protected rights, entitling him to punitive damages under 42 U.S.C. § 1981a.

**COUNT THREE**
**Retaliation**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)**
**(Against Defendant Yale University)**

103.    Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

104.    Mr. Hudson engaged in protected activity under Title VII, including by: objecting directly to Kuzma's discriminatory and harassing conduct; reporting Kuzma's misconduct to management, including First Cook Joshua Russo and, on May 16, 2025, Yale Hospitality's Director of Organizational and Workplace Excellence; filing his June 17, 2025 OIEA complaint; participating in the OIEA investigation; and filing his August 18, 2025 CHRO/EEOC complaint.

105.    Yale and its agents thereafter subjected Mr. Hudson to materially adverse actions, including: intensified harassment, criticism, and unfavorable and last-minute assignments; surveillance and policing of his protected medical leave by the very supervisor he had accused,

including calls to his personal phone; the threat — memorialized in writing by Yale Human Resources — to process his medically necessary absence as a "resignation for job abandonment"; and the months-long failure to remediate the hostile environment or to disclose to Mr. Hudson any discipline imposed on Kuzma — leaving Mr. Hudson, for most of his protected leave, facing return to a workplace still commanded by his abuser.

106.    These actions, individually and collectively, would dissuade a reasonable employee from making or supporting a charge of discrimination. Indeed, Yale's own investigation found that Kuzma's subordinates were "afraid to speak out due to fear of retaliation," and that Kuzma punished employees who displeased him, consistent with his "vindictive streak."

107.    There is a causal connection between Mr. Hudson's protected activity and the adverse actions, as demonstrated by, among other things, their close temporal proximity, Kuzma's knowledge of the accusations against him, and Kuzma's established practice of treating harshly those who objected to his conduct.

108.    As a direct and proximate result of Yale's retaliation, Mr. Hudson suffered the damages described above.

109.    Yale acted with malice or with reckless indifference to Mr. Hudson's federally protected rights, entitling him to punitive damages under 42 U.S.C. § 1981a.

**COUNT FOUR**
**Race Discrimination, Hostile Work Environment, and Retaliation**
**42 U.S.C. § 1981**
**(Against Both Defendants)**

110.    Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

23

111. Section 1981 guarantees to all persons the same right to make and enforce contracts as is enjoyed by white citizens, including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(a)–(b). Mr. Hudson's employment relationship with Yale is a contractual relationship protected by Section 1981.

112. Defendants intentionally discriminated against Mr. Hudson because of his race in the terms, conditions, benefits, and privileges of his employment, including by subjecting him to the racially hostile work environment described above, discriminatorily withholding instruction and support, and imposing discriminatory and degrading working conditions. But for Mr. Hudson's race, Defendants would not have subjected him to this treatment.

113. Defendants also retaliated against Mr. Hudson for his opposition to race discrimination, as described above, in violation of Section 1981.

114. Kuzma personally participated in, directed, and carried out the discriminatory and retaliatory conduct, and is individually liable under Section 1981.

115. Yale is liable for the conduct of its supervisory employee and agent, and for its own failure to prevent and remedy the discrimination of which it had notice.

116. As a direct and proximate result of Defendants' conduct, Mr. Hudson suffered the damages described above.

117. Defendants acted with malice or with reckless indifference to Mr. Hudson's federally protected rights, entitling him to punitive damages.

**COUNT FIVE**
**Disability Discrimination, Harassment, and Unlawful Medical Inquiries and Disclosure**
**Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.**
**(Against Defendant Yale University)**

118.    Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

119.    At all relevant times, Mr. Hudson was a qualified individual who could perform, and did perform, the essential functions of his position.

120.    Mr. Hudson has a disability within the meaning of the ADA, 42 U.S.C. § 12102: he suffered physical and mental impairments — including the serious psychological conditions caused and exacerbated by Defendants' conduct, with symptoms of post-traumatic stress disorder and anxiety — that substantially limited one or more major life activities, including sleeping, concentrating, thinking, interacting with others, and working; he has a record of such impairments, including certified medical leaves; and Yale, through Kuzma, regarded him as impaired — going so far as to tell coworkers that Mr. Hudson was "dying."

121.    Yale, through Kuzma, discriminated against Mr. Hudson because of his actual and perceived disabilities and subjected him to a hostile work environment on that basis, including by: mocking and stigmatizing his workplace injury and instructing him to "sear" his wound "closed" on a hot grill; harassing him for taking medically necessary leave; blaming and demeaning him upon his return; interrogating him about his medical appointments and conditions beyond any legitimate business need; refusing to honor previously approved time off for medical treatment; and broadcasting private medical information — including the false claim that he was "dying" — throughout the workplace.

122.    Kuzma's interrogation of Mr. Hudson regarding his medical conditions and appointments constituted disability-related inquiries that were neither job-related nor consistent

with business necessity, and the dissemination of Mr. Hudson's medical information violated the ADA's confidentiality requirements. 42 U.S.C. § 12112(d).

123.    Yale, through Kuzma, also retaliated against Mr. Hudson and interfered with his exercise and enjoyment of rights protected by the ADA — including his assertion of his right to keep his medical information private and his use of medically necessary leave — in violation of 42 U.S.C. § 12203.

124.    As a direct and proximate result of Yale's conduct, Mr. Hudson suffered the damages described above.

125.    Yale acted with malice or with reckless indifference to Mr. Hudson's federally protected rights, entitling him to punitive damages under 42 U.S.C. § 1981a.

**COUNT SIX**
**Interference and Retaliation**
**Family and Medical Leave Act, 29 U.S.C. §§ 2615, 2617**
**(Against Defendant Yale University)**

126.    Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

127.    At all relevant times, Mr. Hudson was an eligible employee, and Yale was a covered employer, within the meaning of the FMLA, 29 U.S.C. § 2611.

128.    Mr. Hudson exercised rights protected by the FMLA, including medically certified absences for treatment and a continuous medical leave for his own serious health condition beginning June 11, 2025.

129.    Yale interfered with, restrained, and denied the free exercise of Mr. Hudson's FMLA rights, and discriminated and retaliated against him for exercising them, in violation of 29 U.S.C. § 2615, including by: harassing him about and during his medical absences; blaming and

26

punishing him for taking protected leave; refusing to honor previously approved medical time off; directing his accused harasser to contact him during his continuous leave; and threatening, in writing, to process his medically necessary absence as a "resignation for job abandonment" while his physicians' certifications were pending.

130.    Yale's conduct prejudiced Mr. Hudson, chilled and burdened his use of protected leave, caused him monetary losses and the loss of employment benefits, and denied him the peace of protected leave to which the statute entitles him.

131.    Yale's violations were not in good faith, and Yale had no reasonable grounds to believe its conduct was lawful. Mr. Hudson is entitled to damages, liquidated damages, equitable relief, interest, and attorney's fees and costs pursuant to 29 U.S.C. § 2617.

**COUNT SEVEN**
**Discrimination and Hostile Work Environment Because of Race, Color, Sex,**
**Sexual Orientation, and Disability**
**Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60(b)(1) and 46a-81c**
**(Against Defendant Yale University)**

132.    Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

133.    Conn. Gen. Stat. § 46a-60(b)(1) makes it a discriminatory practice for an employer, by the employer or the employer's agent, to discriminate against any individual in terms, conditions, or privileges of employment because of the individual's race, color, sex, or present or past history of mental disability or physical disability, among other protected characteristics. Conn. Gen. Stat. § 46a-81c separately makes it a discriminatory practice for an employer, by the employer or the employer's agent, to discriminate against any individual in terms, conditions, or privileges of employment because of the individual's sexual orientation.

134. By the conduct described above, Yale, by its agent Kuzma, discriminated against Mr. Hudson in the terms, conditions, and privileges of his employment, and subjected him to a hostile work environment, because of his race, color, sex, and actual and perceived disabilities, in violation of Conn. Gen. Stat. § 46a-60(b)(1), and because of his sexual orientation, in violation of Conn. Gen. Stat. § 46a-81c.

135. As a direct and proximate result of Yale's conduct, Mr. Hudson suffered the damages described above, and he is entitled to relief pursuant to Conn. Gen. Stat. §§ 46a-100 and 46a-104, including compensatory damages, attorney's fees, and costs.

## COUNT EIGHT
### Sexual Harassment
### Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(b)(8)
### (Against Defendant Yale University)

136. Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

137. Conn. Gen. Stat. § 46a-60(b)(8) makes it a discriminatory practice for an employer, by the employer or the employer's agent, to harass any employee on the basis of sex or gender identity or expression, including by unwelcome sexual advances or requests for sexual favors, or by conduct of a sexual nature that has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

138. By the conduct described above — including Kuzma's sexual propositions, sexual interrogations, and sexually explicit performances and comparisons, each substantiated in whole or in part by Yale's own investigation — Yale, by its agent Kuzma, sexually harassed Mr. Hudson in violation of § 46a-60(b)(8). The conduct was unwelcome, was severe and pervasive,

and had the purpose and effect of substantially interfering with Mr. Hudson's work performance and creating an intimidating, hostile, and offensive working environment.

139.    As a direct and proximate result of Yale's conduct, Mr. Hudson suffered the damages described above, and he is entitled to relief pursuant to Conn. Gen. Stat. §§ 46a-100 and 46a-104.

**COUNT NINE**
**Retaliation**
**Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(b)(4)**
**(Against Defendant Yale University)**

140.    Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

141.    Conn. Gen. Stat. § 46a-60(b)(4) makes it a discriminatory practice for any person to discharge, expel, or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under the statute.

142.    Mr. Hudson opposed discriminatory employment practices and filed complaints as described above. Yale, by its agents, thereafter discriminated against him in retaliation, by the materially adverse actions described above.

143.    As a direct and proximate result of Yale's retaliation, Mr. Hudson suffered the damages described above, and he is entitled to relief pursuant to Conn. Gen. Stat. §§ 46a-100 and 46a-104.

## COUNT TEN
### Aiding and Abetting Discriminatory Practices
### Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(b)(5)
### (Against Defendant David Kuzma)

144.    Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

145.    Conn. Gen. Stat. § 46a-60(b)(5) makes it a discriminatory practice for any person, whether an employer or an employee, to aid, abet, incite, compel, or coerce the doing of any act declared to be a discriminatory employment practice.

146.    Kuzma, by his conduct described above, aided, abetted, incited, compelled, and coerced the discriminatory employment practices to which Mr. Hudson was subjected, in violation of § 46a-60(b)(5).

147.    As a direct and proximate result of Kuzma's conduct, Mr. Hudson suffered the damages described above, and he is entitled to relief pursuant to Conn. Gen. Stat. §§ 46a-100 and 46a-104.

## COUNT ELEVEN
### Interference and Retaliation
### Connecticut Family and Medical Leave Act, Conn. Gen. Stat. § 31-51pp
### (Against Defendant Yale University)

148.    Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

149.    At all relevant times, Mr. Hudson was an eligible employee, and Yale was a covered employer, under the CTFMLA, Conn. Gen. Stat. § 31-51kk et seq. Mr. Hudson exercised his right to job-protected leave for his own serious health condition, including the continuous leave beginning June 11, 2025.

150.    Yale interfered with, restrained, and denied the exercise of Mr. Hudson's CTFMLA rights, and discriminated against him for exercising them, in violation of Conn. Gen. Stat. § 31-51pp, by the conduct described above, including harassment concerning his protected absences, contacts by his accused harasser during his leave, and the written threat to treat his medically necessary absence as a "resignation for job abandonment."

151.    As a direct and proximate result of Yale's conduct, Mr. Hudson suffered damages, including lost compensation and benefits, and he is entitled to damages and equitable relief.

## COUNT TWELVE
### Intentional Infliction of Emotional Distress
### (Against Defendant David Kuzma)

152.    Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

153.    Kuzma intended to inflict emotional distress upon Mr. Hudson, or knew or should have known that emotional distress was the likely result of his conduct.

154.    Kuzma's conduct was extreme and outrageous, exceeding all bounds usually tolerated by decent society. Among other things, Kuzma: interrogated his new Black subordinate about racial slurs on his first day; told him he had "two strikes" against him for being Black and gay; subjected him to more than a year of racial and sexual degradation; told him, as he stood bleeding from a workplace laceration, to "sear" the wound "closed" on a hot grill; sexually propositioned him and performed simulated sex acts in front of his coworkers; spread false rumors that he was "dying"; exploited his supervisory power to punish resistance and reward submission; and policed the medical leave that his own abuse had made necessary, while rumors and threats to Mr. Hudson's employment accumulated.

31

155. Kuzma's conduct caused Mr. Hudson severe emotional distress, including symptoms of post-traumatic stress disorder, anxiety, humiliation, and psychological injury requiring professional treatment and a medical leave of more than seven months.

156. Kuzma is liable to Mr. Hudson for compensatory damages and, because his conduct was wanton, malicious, and undertaken with reckless disregard of Mr. Hudson's rights, for common-law punitive damages.

## COUNT THIRTEEN
### Negligent Supervision and Retention
### (Against Defendant Yale University)

157. Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

158. Yale owed Mr. Hudson a duty to exercise reasonable care in the supervision and retention of its supervisory employees, including Kuzma.

159. Yale knew or should have known of Kuzma's propensity to harass, degrade, and abuse the employees under his command. Among other things: Kuzma's conduct was open, notorious, and carried out in front of groups of employees; Mr. Hudson reported the misconduct to management, including his May 16, 2025 report to Yale Hospitality's Director of Organizational and Workplace Excellence; other employees had witnessed and experienced Kuzma's conduct over a period of years, but — as Yale's own investigation later recorded — were "afraid to speak out due to fear of retaliation"; and, as Mr. Hudson told Yale, "[s]o many people before me have witnessed and experienced this and he has yet to be held accountable."

160. Notwithstanding this actual and constructive notice, Yale failed to supervise, discipline, restrict, or remove Kuzma; failed to respond to Mr. Hudson's May 16, 2025 report, after which Kuzma escalated within two weeks to the "penis tip" incident; left Kuzma in Mr.

32

Hudson's chain of command — policing his medical leave — even while investigating him; and did not end Kuzma's employment until in or about November 2025, nearly six months after Mr. Hudson's May 16, 2025 report and roughly five months after his formal OIEA complaint. That Yale ultimately parted ways with Kuzma confirms what reasonable supervision would have discovered — and what reasonable care would have done — long before.

161.    It was foreseeable that Yale's failure to supervise and its retention of Kuzma would cause employees under his command, including Mr. Hudson, to suffer emotional and psychological harm of the very kind Mr. Hudson suffered.

162.    As a direct and proximate result of Yale's negligent supervision and retention of Kuzma, Mr. Hudson suffered severe emotional distress and psychological injury, with attendant losses, as described above.

**COUNT FOURTEEN**
**Invasion of Privacy**
**(Against Defendant David Kuzma)**

163.    Mr. Hudson repeats and realleges each and every foregoing allegation of this Complaint as if fully set forth herein.

164.    Mr. Hudson's medical conditions, appointments, and health status were private facts in which Mr. Hudson had a reasonable expectation of privacy.

165.    Kuzma gave unreasonable publicity to Mr. Hudson's private life, broadcasting Mr. Hudson's medical information, appointments, and supposed conditions throughout the workplace, to persons with no legitimate need to know, in a manner highly offensive to a reasonable person and not of legitimate concern to others.

166.    Kuzma also placed Mr. Hudson in a false light before his coworkers by, among other things, falsely telling employees that Mr. Hudson was "dying." The false light in which

33

Mr. Hudson was placed would be highly offensive to a reasonable person, and Kuzma acted with knowledge of or reckless disregard for the falsity of his statements.

167.    As a direct and proximate result of Kuzma's invasion of his privacy, Mr. Hudson suffered severe emotional distress, reputational harm, isolation from his coworkers, and the other damages described above, and is entitled to compensatory and common-law punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Dashawn Hudson respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

a. Compensatory damages, in an amount to be determined at trial, for Mr. Hudson's emotional distress, psychological injury, humiliation, reputational harm, lost wages and benefits, and other pecuniary and non-pecuniary losses;

b. Back pay, lost benefits, and all other economic losses, with prejudgment interest;

c. Punitive damages pursuant to 42 U.S.C. § 1981a, 42 U.S.C. § 1981, and Connecticut common law;

d. Liquidated damages pursuant to 29 U.S.C. § 2617;

e. Permanent injunctive relief enjoining Defendants from subjecting Mr. Hudson to further discrimination, harassment, or retaliation, and ordering Yale to institute and carry out policies, practices, training, and supervision that provide a workplace free of discrimination, harassment, and retaliation;

f. Attorney's fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 12205, 29 U.S.C. § 2617(a)(3), and Conn. Gen. Stat. § 46a-104;

g. Prejudgment and postjudgment interest; and

h. Such other and further legal and equitable relief as this Court deems just and

proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims and issues so triable.


Dated: July 24, 2026

Respectfully submitted,

THE PLAINTIFF,
DASHAWN HUDSON

By:  /s/ Alexander T. Taubes
Alexander T. Taubes, Esq.
Taubes Law
470 James Street, Suite 007
New Haven, CT 06513
Tel.: (203) 909-0048
alextt@gmail.com
Federal Bar No. ct30100
His Attorney